UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL 'O'**

| | | | |
|---|---|---|---|
| Case No. | 2:26-cv-06550-CAS-BFMx | Date | October 19, 2026 |
| Title | Synergy HR LLC et al v. Next Level Administrators, LLC et al. | | |

| | |
|---|---|
| Present: The Honorable | CHRISTINA A. SNYDER |

| | | |
|---|---|---|
| Catherine Jeang | Amy Diaz | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| | |
|---|---|
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Joseph Gjonola<br>Nicholas Roxborough | Marc Miles |

**Proceedings:** DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS (Dkt. 17, filed August 21, 2026)

## I. INTRODUCTION

On June 16, 2026, plaintiffs Synergy HR LLC d/b/a Zynergia HR, Zynergia Insurance Agency LLC, and Zynergia Staffing, LLC (collectively, "Synergy" or "Plaintiffs") filed their complaint against Next Level Administrators, LLC ("Next Level"), Acrisure Claims Services, LLC ("ACS"), and Does 1 through 25, inclusive (collectively, "Defendants"). Dkt. 1 ("Compl."). Plaintiffs assert five claims for relief against all defendants: (1) breach of contract — third-party beneficiary; (2) breach of implied covenant of good faith and fair dealing; (3) professional negligence/claims mishandling; (4) breach of fiduciary duty; and (5) tort of another. Id.

On August 21, 2026, defendants filed the instant motion to dismiss. Dkt. 17-1 ("Mot."). On September 28, 2026, plaintiffs filed an opposition. Dkt. 19 ("Opp."). On October 5, 2026, defendants filed a reply. Dkt. 20 ("Reply").

On October 19, 2026, the Court held a hearing. Having carefully considered the parties' arguments and submissions, the Court finds and concludes as follows.

## II. BACKGROUND

Plaintiffs allege the following in their complaint:

### A. The Parties

Plaintiffs Synergy HR LLC d/b/a Zynergia HR, Zynergia Insurance Agency LLC, and Zynergia Staffing, LLC are limited liability companies organized under the laws of Indiana, with a principal place of business in Encino, California. Compl. ¶ 8.

Defendant Next Level is a limited liability company organized under the laws of Florida, with a principal place of business in Bradenton, Florida. Id. ¶ 13. Defendant ACS is, on information and belief, a limited liability company organized under the laws of Michigan, with a principal place of business in Grand Rapids, Michigan. Id ¶ 14. Both Next Level and ACS are third-party administrators engaged in the business of administering workers' compensation insurance claims. Id. ¶¶ 13-14.

On information and belief, Next Level was acquired by Acrisure MGA, LLC on or about December 1, 2021, and has since that date operated as part of the "Acrisure corporate family." Id. ¶ 13. On information and belief, since that merger, ACS has provided the same claims administration services to Sunz Insurance Company and its insureds, including plaintiffs, as Next Level previously provided. Id. ¶ 14. On information and belief, Next Level and ACS were at all times relevant to this action the agents, joint venturers, alter egos, parent corporations, subsidiaries, affiliates, predecessors and successors-in-interest, or contractors of each other, and they are jointly and severally liable for the conduct alleged in the complaint. Id. ¶ 16.

Does 1 through 25, inclusive, are unknown defendants who are, on information and belief, legally responsible in some manner for the conduct described in the complaint. Id. ¶ 15.

### B. The Instant Dispute

#### 1. Plaintiffs' Participation in the SIS Workers' Compensation Program

Beginning on or about August 1, 2022, and continuing in successive annual program years until an early cancelation in October 2025, plaintiffs participated in a workers' compensation insurance program structured by SUNZ Insurance Solutions, LLC ("SIS") as managing general agent for SUNZ Insurance Company ("Sunz"), with UWIC as a companion carrier in certain non-Sunz states (the "SIS Program"). Id. ¶ 25. In each program year, Sunz or UWIC issued one or more workers' compensation and employers' liability insurance policies covering plaintiffs' workforces. Id. Specifically, Synergy HR

LLC and Zynergia Staffing, LLC were the named insured on a series of workers' compensation insurance policies issued in the SIS program, including UWIC policy WC603-00113-022-SZ for the 2022-2023 program year and Sunz policies WC080-00066-023, WC080-00066-024, and WC304-00003-025 for the 2023-2024, 2024-2025, and 2025-2026 program years, respectively. See id. ¶¶ 8, 11.

The SIS program is a "large deductible workers' compensation program." Id. ¶ 25. Under the policies, the per-accident deductible is $500,000. Id. Plaintiffs are responsible for paying all claim expenses within the deductible layer (the "Deductible"), and Sunz or UWIC is responsible only for claim expenses in excess of the deductible. Id. In addition to funding the deductible, plaintiffs are required to fund prospective actuarial calculated reserves above and beyond the deductible layer, including case reserves for claims incurred but not reported and other estimates of ultimate cost (collectively, the "Program Reserves"). Id. Collectively, the deductible and program reserves are called the "Loss Fund." Id.

Plaintiffs funded the Loss Fund by making weekly deductible contributions and monthly program reserves contributions in an amount tied to the manual premium. Id. ¶ 27. SIS drew on the Loss Fund to reimburse Sunz for claim expenses within the deductible layer that had been paid out of the "Claims Bank Account" and to pay other program expenses, including fees charged by Next Level. Id.

2. The Claims Services Agreement between Sunz and Next Level

On or about May 17, 2016, Sunz and Next Level entered into a Claims Services Agreement (the "CSA"). Id. ¶ 29, Ex. A ("CSA"). Under the CSA, Next Level undertook "the responsibility to provide claims adjusting and administration services" with respect to assigned claims or incidents arising under Sunz insurance policies. CSA § 2.1.

The CSA states, in relevant part:

> THIS CLAIMS SERVICES AGREEMENT ("Agreement") is by and between SUNZ Insurance Company . . . ("Company"), and Next Level Administrators, LLC . . . .("Service Company" or "NLA ").
>
> . . . .

WHEREAS, The Company desires to engage Service Company to provide the Services and Service Company desires to provide such Services to the Company in connection with certain insurance programs provided by Company to its insureds including those in which another insurer is the "front" or issuing carrier and Company is the 100% reinsurer. (the "Programs").

. . .

[2.2] b) Service Company shall investigate and adjust, settle or deny all claims in accordance with applicable state and federal laws, subject to the ultimate authority of the Company as provided in Article 3 hereof . . . .

. . . .

[2.2] f) Service Company shall provide a written notice, approved by the Company, to insureds advising each insured of the identity of, and relationship among, the Service Company, the policyholder, and the Company.

[2.2] g) Claims Bank Account

i. Company shall establish, fund, and maintain a Claims bank account ("Claims Bank Account") which the Service Company may draw against as provided in this Agreement. . . . The Service Company shall maintain such funds in trust for the Company and act at all times within its fiduciary capacity as required by law . . . Any and all funds of the Company held by the Service Company are the exclusive property of the Company, held for the benefit of the Company, and are subject to the control of the Company.

. . . .

[2.2] l) Service Company, in connection with the performance of its obligations under this Agreement, shall provide trained, competent, and where required, licensed claims adjusters who shall be located at Company's offices where practicable and perform the services to be rendered hereunder in a manner commensurate with professional standards, in good faith, and in accordance with all applicable laws and regulations.

. . . .

13.8 The provisions of this Agreement are for the sole benefit of Company and Service Company, and neither will be liable under this Agreement to any other person for any loss, liability, damage or expense. There are no third-party beneficiaries to this Agreement.

Id.

The CSA has been amended three times. On January 1, 2018, Addendum No. 1 went into effect, providing that Next Level shall provide "healthcare cost containment and medical bill review services" ("MBR Services"). CSA at 21. The MBR services "consist of analyzing healthcare provider billings for coding errors, duplication and fraud[,] and re-pricing billed charges" to the lesser of several specified amounts. Id. Addendum No. 1 further provides that Next Level is paid 5% of "earned total standard premium 'as payment for all claims administration services'" and that Next Level may receive additional compensation in the amount of 22% of "savings achieved" for MBR services. Compl. ¶ 33. On October 1, 2018, Addendum No. 2 went into effect, providing that Next Level will provide "investigation services." Id. ¶ 34; CSA at 23. On December 18, 2024, Addendum No. 3 went into effect, stating that Next Level's operations were being merged into ACS and adding ACS to the CSA as a party with the same rights and obligations as Next Level. Compl. ¶ 35; CSA at 28.

### C. The Dispute Between Sunz and Next Level

In early 2026, Sunz filed suit against Next Level in the Circuit Court of the Twelfth Judicial Circuit in Manatee County, Florida (the "SUNZ Action"). See Compl. ¶ 38. Next Level subsequently removed the action to the U.S. District Court for the Middle District of Florida. See id.; Sunz Ins. Co. v. Next Level Adm'rs, LLC, No. 8:26cv564 (M.D. Fla. Mar. 3, 2026).

Plaintiffs allege the following, based in part on filings in the SUNZ Action and on contemporaneous correspondence between counsel for Sunz and counsel for defendants, see Compl. ¶ 41:

Defendants paid medical bills on workers' compensation claims that they had denied being coverable. Id. ¶ 42. Defendants also charged medical billing review fees

("MBR Fees") on workers' compensation claims that been denied, even though the CSA did not permit medical billing review on denied claims. Id. ¶ 45. For example, Next Level paid a $34,249 medical bill on a denied claim notwithstanding an internal note dated February 3, 2025, to Jeff Kuss, the President of Next Level, stating, "Don't pay bill." Id. ¶ 42. Next Level then charged the policyholder a $3,897 MBR fee on the wrongfully paid bill. Id. ¶ 43.

Defendants assessed duplicate or multiple MBR fees on the same invoice. Id. ¶ 47. For example, Sunz identified that Next Level had processed the same invoice five times, rejecting it four times and partially paying it one time. Id. Next Level then charged three separate MBR fees on that single invoice in the amounts of $56,189.32, $56,189.32, and $54,738.28. Id.

Defendants assessed MBR fees in excess of fee caps upon which insured entities had agreed with Sunz. Id. ¶ 48. In late 2024 and throughout 2025, Next Level adopted a "pattern and practice" of disregarding the agreed-upon caps. Id.

Defendants charged MBR fees on medical bills processed after claims had been settled, when no medical bill review is permitted. Id. ¶ 50. Defendants also charged MBR fees on medical bills processed after claims were closed. Id. Defendants also charged MBR fees on medical bills that were rejected for procedural reasons, such as bills rejected for missing documentation, lack of prior authorization, or unapproved procedures. Id. ¶ 51. Because there is no substantive billing on procedurally rejected bills, "[c]harging a savings-based MBR fee . . . misrepresents that review work was performed and savings were achieved when neither is true." Id.

Defendants charged MBR fees assessed on bills that Sunz had refused to pay as part of settlement. Id. ¶ 52. For example, after Sunz had agreed to pay only 20% of medical bills related to a claim, Next Level assessed an MBR fee equal to 22% of the remaining 80% that Sunz had expressly refused to pay, even though the reduction had been achieved by settlement terms and not by medical bill review. Id.

Defendants violated contractual limits set by the CSA and "Quotation Agreements" by (1) submitting invoices from their affiliate, Watchpoint Investigative Services, with fees in excess of the agreed-upon flat fee per day of surveillance; (2) causing these amounts to be withdrawn from the Claims Bank Account despite the fact that Sunz typically paid Next Level for these fees as part of a separate administration fee;

and (3) withdrawing fees for which there was "no contractual basis whatsoever" from the Claims Bank Account. Id. ¶ 54.

Between November 2025 and January 2026, Sunz put Next Level on notice of these and other categories of wrongful conduct. Id. ¶ 57. On March 2, 2026, Sunz's Chief Accountant, Dave Skup, wrote directly to Jeffrey Kuss, President of Next Level, advising that Sunz was withholding Next Level's fee for the month because Next Level had improperly assessed millions of dollars in MBR fees and improperly paid medical bills on claims it was adjusting, thereby damaging Sunz and its insureds. Id. ¶ 58.

Throughout this period, defendants did not investigate the wrongful charges, did not refund any wrongful charges to plaintiffs or other insureds, did not cease the wrongful conduct, and did not commit to any corrective action. Id. ¶ 58. Defendants instead continued to assess wrongful MBR fees and to engage in the categories of mishandling described. Id.

**D. The Instant Dispute Between Synergy and Next Level**

Defendants administered every workers' compensation claim under every policy issued to Plaintiffs by Sunz. Compl. ¶ 40. Plaintiffs are informed and believe that the number of such claims brought by its California-resident employees exceeds 1,500. Id.

Defendants' administration of plaintiffs' claims included and continues to include the categories of mishandling described above. Id. ¶ 40.

Moreover, plaintiffs allege certain types of mishandling specific to Synergy. First, Sunz has identified at least twenty MBR fees that defendants assessed against Synergy claims in excess of the applicable per-bill cap, with aggregate overcharges exceeding $360,000. Id. ¶ 49.

Second, on information and belief, defendants set case reserves on plaintiffs' claims at amounts in excess of those a reasonably competent third-party administrator would set under the relevant standards of care. Id. ¶ 53. Additionally, defendants inflated case reserves on plaintiffs' claims after plaintiffs decided to transition claims administration to another third-party administrator in 2025. Id. The inflated case reserves had the mathematical effect of increasing the Loss Fund balance that SIS could demand from plaintiffs. Id. Plaintiffs allege that this was defendants' intended outcome.

Id. The inflated case reserves also increased the actuarial Program Reserves that plaintiffs were required to fund above and beyond the deductible layer. Id.

On information and belief, defendants also occasionally paid workers’ compensation claims – or portions of claims – in excess of the applicable per-accident deductible from plaintiffs’ Loss Fund, rather than from the insurance carrier’s funds. Id. ¶ 55. Defendants later credited those amounts back to the Loss Fund. Id.

On information and belief, defendants engaged in additional categories of mishandling of plaintiffs’ claims, including, but not limited to: (a) failures to pursue subrogation rights for the benefit of plaintiffs, as required by section 2.2(m) of the CSA; (b) failures to investigate prior injuries and to develop apportionment defenses, with the result that plaintiffs paid full-value settlements where partial-value settlements would have been appropriate; (c) failures to timely pursue settlement opportunities, with the result that claims became more expensive over time than they should have been; (d) failures to provide qualified medical evaluators with complete medical records, with the result that medical-legal opinions were rendered on incomplete information; (e) improper allocation of allocated loss adjustment expenses; and (f) failures to supervise, monitor, and audit the performance of defendants’ own adjusters. Id. ¶ 56.

As a direct and proximate result of defendants’ conduct, plaintiffs have suffered damages, including (1) MBR fees and other charges assessed against plaintiffs’ claims in excess of contractual caps; (2) MBR fees assessed on denied, settled, and closed claims, for which no bill review was permitted; (3) duplicate, multiple, or post-closure MBR fees; (4) payments on bills that should not have been paid; (5) excessive fees for services provided by defendants and their affiliates, (6) unnecessary costs incurred because of defendants’ errors and omissions; (7) wrongfully inflated loss fund obligations and security demanded by SIS; (8) increased premiums and program costs; and (9) consequential damages. Id. ¶ 61. Plaintiffs’ other injuries include the termination of plaintiffs’ workers’ compensation insurance policies due to their inability to pay the inflated Loss Fund demand; legal exposure arising from defendants’ improper payments on denied claims; higher premiums on replacement workers’ compensation coverage; lost clients, business, profits, and interest; and reputational damage. Id.

| | | | |
|---|---|---|---|
| Case No. | 2:26-cv-06550-CAS-BFMx | Date | October 19, 2026 |
| Title | Synergy HR LLC et al v. Next Level Administrators, LLC et al. | | |

## III. LEGAL STANDARD

A motion pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims asserted in a complaint. Under this Rule, a district court properly dismisses a claim if "there is a 'lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.'" Conservation Force v. Salazar, 646 F.3d 1240, 1242 (9th Cir. 2011) (quoting Balisteri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1988)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). "[F]actual allegations must be enough to raise a right to relief above the speculative level." Id.

In considering a motion pursuant to Rule 12(b)(6), a court must accept as true all material allegations in the complaint, as well as all reasonable inferences to be drawn from them. Pareto v. FDIC, 139 F.3d 696, 699 (9th Cir. 1998). Courts may also consider exhibits attached to the complaint without converting the motion to a motion for summary judgment. Parks Sch. of Bus., Inc. v. Symington, 51 F.3d 1480, 1484 (9th Cir. 1995) The complaint must be read in the light most favorable to the nonmoving party. Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001). However, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009); see Moss v. United States Secret Service, 572 F.3d 962, 969 (9th Cir. 2009) ("[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief."). Ultimately, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679.

As a general rule, leave to amend a complaint that has been dismissed should be freely granted. Fed. R. Civ. P. 15(a). However, leave to amend may be denied when "the court determines that the allegation of other facts consistent with the challenged pleading

could not possibly cure the deficiency." Schreiber Distrib. Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir. 1986).

## IV. DISCUSSION

### A. Contract Claims

Defendants argue that plaintiffs' claim for breach of contract fails because plaintiffs are not third-party beneficiaries of the CSA. Mot. at 7. First, defendants argue that Sunz and Next Level expressly stated in the CSA that "the provisions of the CSA were solely for their benefit" and not for the benefit of any other individuals or entities. Id. (citing CSA § 13.8). Second, defendants argue that plaintiffs are not third-party beneficiaries of the CSA under Goonewardene v. ADP, LLC, 6 Cal. 5th 817 (2019). Mot. at 8. Plaintiff argues that section 13.8 reflects that the contracting parties did not have "a motivating purpose to benefit the third party" even if they had "knowledge that a benefit to the third party may follow from the contract." Id.; Goonewardene at 832.

Defendants also dispute plaintiffs' interpretations of certain CSA provisions. Mot. at 9-12. Defendants argue that sections 2.2(g)(i), 2.2(l), and 2.2(f) are "general" provisions that must yield to the more "specific" provision set forth in section 13.8. See id. at 12. First, defendants dispute plaintiffs' reading of section 2.2(g)(i), which plaintiffs allege requires defendants to maintain Claims Bank Account funds "in trust" and in a "fiduciary capacity." Mot. at 9; CSA § 2.2(g)(i). Defendants contend that plaintiffs omit the remainder of the provision, which states that any funds are "the exclusive property of the Company [Sunz Insurance Co.], held for the benefit of the Company, and subject to the control of the Company." See Mot. at 9; CSA § 2.2(g)(i). In other words, defendants argue that section 2.2(g)(i) requires defendants to "maintain a Claims Bank Account which held funds in trust *for Sunz Insurance Co.*," thereby "confirming" that Sunz is the beneficiary of the CSA, not plaintiffs. Mot. at 9 (emphasis in original). Defendants argue that, at most, plaintiffs have shown that they may bear an economic burden as a result of the claims payments through the program's deductible reimbursement program, but this is an insufficient showing to establish third-party beneficiary status under Goonewardene. Id.

Second, defendants argue that plaintiffs' reliance on section 2.2(l) is misguided. Mot. at 10-11. Defendants argue that "the provision establishes the standard by which [d]efendants agreed to perform services *to Sunz Insurance Co.* under the contract." Id. at

11 (emphasis in original). Defendants further dispute plaintiffs' contention that because the "applicable laws and regulations" referenced in section 2.2(l) include California's workers' compensation laws, plaintiffs are afforded protection under the CSA. Id. Defendants argue that "the mere existence of a statewide workers' compensation scheme does not establish third party beneficiary status." Id. Instead, defendants argue that this "generic comply-with-law" provision offers no indication that a motivating purpose of the contract was to confer rights to plaintiffs. Id.

Third, plaintiffs argue that section 2.2(f)—which requires defendants to provide insured parties with a written notice explaining the relationships between New Level, Sunz, and the insureds—"does not state or even vaguely suggest that because [d]efendant sent out such notices, that all insureds may enforce the CSA." Id. at 12.

Finally, defendants compare the instant case to Thompson v. Cannon, 224 Cal. App. 3d 1413 (1990). Mot. at 12-13. Defendants argue that like in Thompson, which involved an insured's attempt to enforce a contract between her insurance company and an independent claims adjuster, the CSA here "cannot in any sense be said to have been made for the express benefit" of plaintiffs. Id. at 13 (quoting Thompson, 224 Cal. App. 3d at 1417).

In opposition, plaintiffs argue that Goonewardene supports a finding that they have standing to bring their breach of contract claim as a third-party beneficiary of the CSA. Opp. at 7. Plaintiffs argue that Goonewardene requires the Court to undertake a "fact-intensive" inquiry. Id. at 7-8. Plaintiffs argue that whereas the facts alleged in Goonewardene was "extraordinarily thin," plaintiffs here have attached multiple fact-laden exhibits to their complaint. Id.

Plaintiffs further argue that they meet each prong of the Goonewardene test. First, plaintiffs argue that as a third party, it did "not merely benefit incidentally from [Next Level]'s performance of the CSA; Synergy's balance sheet is [instead] the field of play on which [Next Level]'s performance operates." Id. at 8. Plaintiffs argue that defendants' alleged misconduct "moved money from or to Synergy's balance sheet and income statement, directly reducing Synergy's profits." Id. Plaintiffs argue that while the employee-plaintiff in Goonewardene brought suit against her employer's payroll processor, which "use[d] the employer's funds" to issue the employee's paychecks, here, plaintiffs and their finances are the ones that are "directly affected by every decision NLA made." Id.

As to Goonewardene's second prong, plaintiffs argue that the contracting parties had a motivating purpose to confer benefits on the insured, including plaintiffs. Id. Plaintiffs argue that the CSA's preamble confirms that the "insurance programs provided by [Sunz] to its insureds" are the CSA's "subject matter" and "operative content." Id. at 9. Plaintiffs argue that section 2.2(f)'s written notice requirement is "structurally incompatible" with the notion that the insureds "were not within the parties' motivating purpose," and they reiterate that the California workers' compensation regulations have a "central" purpose of regulating practices that affected insured parties like plaintiffs. Id. at 9-10. Plaintiffs further argue that defendants' "literal reading" of section 2.2(g) does not change the fact that "the monies flowing through the Claims Bank Account are, in economic substance, Synergy's monies." Id. at 10. Plaintiffs argue that the funds in the Claims Bank Account "originate from Synergy's Loss Fund contributions, [] are drawn against Synergy's contractual reimbursement obligation, and *any surplus returns to Synergy*." Id. (citing Compl. ¶¶ 26-27) (emphasis in original). Plaintiffs also argue that Next Level had "de facto operational authority to withdraw funds from the Claims Bank Account" without approval from SIS or Sunz. Id. at 11. Plaintiffs argue that this "custodial control" over the Claims Bank Account reflects a "motivating purpose to protect the insureds whose contributions the account holds." Id. at 11. Accordingly, plaintiffs argue that these "specific insured-facing duties" control over section 13.8's "general" and "boilerplate" disclaimer of third-party beneficiaries. Id. at 11, 13-14.

Plaintiffs point to two sources of "extrinsic evidence" that they say confirm the CSA's motivating purpose was to benefit the insureds, including plaintiffs. Id. at 11-12. First, plaintiffs argue that the exhibits attached to the complaint include court filings in the SUNZ Action, which allege that Next Level's misconduct damaged Sunz's "insured." Id. Plaintiffs also argue that filed letters between Sunz-affiliated personnel and Next Level personnel similarly reflect "characterizations, by [defendants'] own contracting counterparty" of "the CSA's protective purpose" with respect to the insured. Id. Second, plaintiffs argue that the CSA's Addendum No. 1 reflects that the compensation structure between Sunz and defendants was "expected to affect insureds' economic position" because Next Level was paid relative to "the volume and character of the claim-payment and MBR decisions affecting Synergy's Loss Fund." Id. at 12. Plaintiffs also contend that this compensation structure distinguishes the instant case from Goonewardene, wherein the defendant's "fixed fee for payroll processing bore no relationship" to its performance with respect to the plaintiff. Id.

With respect to Goonewardene's third factor, plaintiffs argue that "the CSA's stated objective is the proper administration of the insureds' claims." Id. at 14. Plaintiffs also argue that the above-mentioned filings in the SUNZ Action support a finding that the parties reasonably expected the insured to seek redress under the CSA. Id. Finally, plaintiffs distinguish Goonewardene by noting that the plaintiff in that case "had complete statutory remedies against her employer for wage-and-hour violations," whereas here, "[d]efendants have identified no statutory cause of action against NLA, nor other vehicle, by which Synergy can recover" relief from defendants. Id.

Finally, plaintiffs argue that defendants' motion asks the Court to "make factual findings, resolve inferences against the pleader, and disregard properly incorporated exhibits, none of which Rule 12(b)(6) permits." Id. at 16.

In reply, defendants argue that plaintiffs' arguments blur California courts' "critical distinction between a party who may *benefit* from a contract and a party who possesses *enforceable rights* under that contract." Reply at 2 (emphasis in original). Defendants reject plaintiffs' characterization of section 13.8 as "boilerplate" and argue that the "parties could not have been clearer" about their intent with respect to third-party beneficiaries. Id. at 3.

Defendants also argue that the "specific-controls-general" rule "does not help [p]laintiffs because the CSA contains no provision granting insureds [specific] enforceable rights in the first place." Id. at 4. In support of their position, defendants argue that plaintiffs' cited authority, Prouty v. Gores Technology Group, 121 Cal. App. 4th 1225 (2004), is distinguishable from the case at hand. Id. at 4. Defendants argue that in Prouty, the contract in question contained a specific provision that granted protections to terminated employees who were not parties to the contract. Id. The court in that case emphasized that the provision "expressly benefited" the non-signatory employees "and only [benefitted] them." Id. Accordingly, the Prouty court held that the termination protections provision ran contrary to the contract's general disclaimer of third-party beneficiaries. Id. Here, in contrast, defendants argue that the CSA provisions on which plaintiffs rely do not confer any protections or promises to the insureds. Id. Accordingly, there is no basis for a finding of conflict between plaintiff's relied-upon CSA provisions and section 13.8's disclaimer.

Finally, defendants reiterate their argument that plaintiffs do not meet Goonewardene's requirements for third-party beneficiary status. Id. at 7. Defendants

argue that Goonewardene was concerned that "allowing third parties to sue on contracts could disrupt the contractual relationship between the actual contracting parties." Id. Here, however, defendants argue that the SUNZ Action reflects that "the contracting party"—Sunz—"remains fully capable of enforcing its rights." Id.

Under California law,[1] "[a] contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it." Cal. Civ. Code § 1559. "The contract need not name a beneficiary specifically or individually in the contract; instead, it can specify a 'class clearly intended by the parties to benefit from the contract.'" GECCMC 2005-C1 Plummer St. Off. Ltd. P'ship v. JPMorgan Chase Bank, Nat. Ass'n, 671 F.3d 1027, 1033 (9th Cir. 2012) (quoting Klamath Water Users Prot. Assoc. v. Patterson, 204 F.3d 1206, 1211 (9th Cir. 1999)).

To determine whether a third party has standing to enforce a contract to which it is not a signatory, courts examine "(1) whether the third party would in fact benefit from the contract . . . (2) whether a motivating purpose of the contracting parties was to provide a benefit to the third party, and (3) whether permitting a third party to bring its own breach of contract action against a contracting party is consistent with the objectives of the contract and the reasonable expectations of the contracting parties." Goonewardene, 6 Cal. 5th at 830. "All three elements must be satisfied to permit the third party action to go forward." Id. "Although disputes regarding purported third-party beneficiaries may in some circumstances be questions of fact, dismissal at the pleading stage is appropriate where it is clear from the terms of the contract and the circumstances alleged in the complaint that the plaintiff was not a third-party beneficiary." City of Oakland v. Oakland Raiders, No. 18-CV-07444, 2019 WL 3344624, at *14 (N.D. Cal. July 25, 2019) (citing Goonewardene, 6 Cal. 5th at 822-37, 842-43).

Neither party appears to dispute that plaintiffs "would in fact benefit from the contract" consistent with the first Goonewardene factor. See Opp. at 8-9; Reply at 5-6. Accordingly, the Court focuses on the second and third Goonewardene factors. The second factor requires the contracting parties to have "a motivating purpose to benefit the third party, and not simply knowledge that a benefit to the third party may follow from the contract." Goonewardene, 6 Cal. 5th at 830. California's "intent-to-benefit case law

[1] Neither party disputes that California law governs the question of whether plaintiffs are third-party beneficiaries of the CSA.

[is] pertinent in applying this element" of the test. Id. The third Goonewardene factor "does not focus upon whether the parties specifically intended third party enforcement but rather upon whether, taking into account the language of the contract and all of the relevant circumstances under which the contract was entered into, permitting the third party to bring the proposed breach of contract action would be 'consistent with the objectives of the contract and the reasonable expectations of the contracting parties.'" Id.

The Court finds that the CSA does not convey a "motivating purpose" to benefit plaintiffs as insureds. Although Goonewardene involves not a third-party insurance claims administrator but a contracted payroll company, the Court finds its logic instructive. In Goonewardene, an employee sought to enforce a contract between her employer and the defendant, under which the employer delegated to the defendant its "ordinary payroll tasks, including calculating the wages [the employer] was obligated to pay under the governing labor statutes and wage orders and issuing paychecks and pay stubs that reflect the correct wages." Id. at 833. The California Supreme Court concluded that "the relevant motivating purpose of the contract is simply to assist the employer in the performance of its required tasks, not to provide a benefit to its employees with regard to the amount of wages they receive." Id. at 835. The Goonewardene court explained:

> the relevant motivating purpose is to provide a benefit *to the employer*, with regard to the cost and efficiency of the tasks performed and the avoidance of potential penalties. Although the employer intends that the payroll company will accurately calculate the wages owed to its employees under the applicable labor statutes and wage orders, in situations in which it may be unclear or debatable as to how the applicable rules should be interpreted or applied, the employer would reasonably expect the payroll company to proceed with the employer's interest in mind.

Id.

Similar reasoning has guided courts in determining whether insured plaintiffs have third-party beneficiary status under an insurance company's contract with a contracted service. In Thompson, for example, the California Court of Appeal rejected an insured plaintiff's claim that she was a third-party beneficiary of the insurance company's contract with an independent adjuster, reasoning that "[w]hen there is a dispute as to

coverage of an insured's claim, it cannot be said that the retention of an independent adjuster by an insurer is expressly for the benefit of the insured." 224 Cal. App. 3d at 1416. Like the California Supreme Court in Goonewardene, the Court of Appeal elaborated:

> The insurance adjuster is the agent of the insurer. That the adjuster can under particular fact situations become also the agent of the insured is clear, and this most usually will occur when no issue as to coverage arises. Where coverage is in issue, however, it is obvious that the adjuster's loyalties are divided and the insured and his counsel cannot reasonably expect that he represents only the interest of the insured.

Id.; see also Henry v. Associated Indem. Corp., 217 Cal. App. 3d 1405, 1417 (1990) (holding that "the claims adjustment contract can in no sense be said to have been made for the express benefit of a third person policyholder," in part because the contract did not "impose any new duties to [plaintiff] other than those that inhere in the actual contract of insurance"). More recently, a federal district court in the Ninth Circuit found that insured plaintiffs had no third-party beneficiary status with respect to their health insurance company's contract with a mental health services provider. Roiz v. Blue Shield of Cal. Life & Health Ins. Co., No. 25-CV-09978, 2026 WL 2859959, at *1 (N.D. Cal. Sept. 23, 2026) (finding that "the main purpose of the contract is to allow Blue Shield to offer a comprehensive insurance product that includes mental health[; ]the intended beneficiary of the contract is Blue Shield, not its members").

Although none of these cases present precisely on-point facts, their logic holds. Defendants' contract with Sunz was intended to benefit *Sunz*, not the insured, by assisting Sunz in performing its necessary tasks, including "claims adjusting, cost containment, case management, and administrative services." CSA at 28. Should a dispute arise between the insured and the insurer, or should an ambiguity arise with respect to the proper course of defendants' conduct, the insurer would "reasonably expect" the defendants "to proceed with the [insurance company]'s interest in mind." See Goonewardene, 6 Cal. 5th at 835; see also, e.g., CSA § 2.2(b) (requiring defendants to "investigate and adjust, settle or deny all claims . . . subject to the *ultimate authority of the Company* [i.e., Sunz]" (emphasis added)); id. § 2.2(g)(i) (requiring that defendants maintain Claims Bank Account "funds in trust *for the Company*" (emphasis added)); id. §

2.2(m) (requiring defendants to "protect any subrogation rights *of the Company*" (emphasis added)).

The Court does not find plaintiffs' counterarguments persuasive. First, the fact that Sunz's "insured" are "incidentally named in the contract, or that the contract, if carried out according to its terms, would inure to [their] benefit, is not sufficient to entitle [them] to demand its fulfillment." LaBarbera v. Sec. Nat'l Ins. Co., 86 Cal. App. 5th 1329, 1341 (2022) (quoting Eastern Aviation Group, Inc. v. Airborne Express, Inc., 6 Cal. App. 4th 1448, 1452 (1992))). Instead, "[i]t must appear to have been the intention of the parties to secure to [the third party] personally the benefit of its provisions." Id. As discussed above, the CSA fails to give rise to such intent.

Second, "[a] third-party beneficiary may enforce only those terms of the contract that were made for its benefit." Int'l Fruit Genetics, LLC v. Grapery, Inc., No. F085739, 2023 WL 5215223, at *9 (Cal. Ct. App. Aug. 15, 2023) (quoting Clark v. Cal. Ins. Guarantee Ass'n, 200 Cal. App. 4th 391, 398 (2011)). Accordingly, even if plaintiffs had third-party beneficiary status pursuant to section 2.2(f)—the only identified CSA provision that plausibly gives rise to a "new duty" to the insured, see Henry, 217 Cal. App. 3d at 1417—plaintiffs could enforce only that particular provision. See Int'l Fruit Genetics, 2023 WL 5215223, at *9. Because plaintiffs do not bring their breach of contract claim to enforce section 2.2(f), see Compl. ¶ 67, their reliance on this provision cannot sustain entitlement to third-party beneficiary status in the instant action.

Third, plaintiffs' argument that the CSA requires defendants to comply with applicable workers' compensation law is inconsistent with the California Supreme Court's reasoning in Goonewardene. Assuming *arguendo* that plaintiffs are intended beneficiaries of workers' compensation laws, the Goonewardene court did not in any way suggest that the plaintiff employee in that case was entitled to third-party beneficiary status given the payroll company's contractual obligation to comply with "applicable labor statutes and wage orders." 6 Cal. 5th at 826; see McLean v. State of California, 1 Cal. 5th 615, 622 (2016) (explaining that California Labor Code provisions are intended to protect and benefit employees). Instead, the California Supreme Court found that, with respect to the third Goonewardene factor,

> there is no need to permit a third-party employee to bring suit to enforce an alleged breach by [the payroll company] of its obligations under the contract, because [the employer] is available and is fully capable of pursuing a breach

> of contract action against [the payroll company] if, by failing to comply with its contractual responsibilities, [the payroll company] renders [the employer] liable for any violation of the applicable wage orders or labor statutes. Simply put, permitting an employee to sue [the payroll company] for an alleged breach of its contractual obligations to [the employer] is not necessary to effectuate the objectives of the contract.

Goonewardene, 6 Cal. 5th at 836.

As in Goonewardene, a contractual provision requiring a signatory to comply with applicable law does not necessarily give rise to third-party beneficiary status for those who may benefit from such a requirement. Instead, the relevant question is whether it is "consistent with the objectives of the contract" to grant a third party the ability to enforce the contract's requirement. See id. Here, as in Goonewardene, it is not consistent with the objectives of the contract. Indeed, Sunz has brought a separate action to enforce its contract with defendants in the District Court for the Middle District of Florida, underscoring that it is not necessary to grant plaintiffs third-party beneficiary status to "effectuate the objectives of the contract" here. See Sunz Ins. Co., No. 8:26cv564 (M.D. Fla. Mar. 3, 2026); Goonewardene, 6 Cal. 5th at 836.

It is also inconsistent with "the reasonable expectations of the contracting parties" to permit plaintiffs to bring a breach of contract claim here. See Goonewardene, 6 Cal. 5th at 836. Not only would third-party beneficiary status "impose substantial additional [litigation] costs" on third-party claims administrators that would be passed on to insurance companies that "typically prefer to avoid" those costs, see id., but also section 13.8's disclaimer does not comport with the premise that a third-party beneficiary lawsuit is "consistent with the objectives of the contract and the reasonable expectations of the contracting parties" in the absence of evidence of contrary intent. See Fanmio, Inc. v. Garcia, No. 2:25-CV-02221, 2026 WL 1674277, at *11 (C.D. Cal. June 4, 2026) (finding that plaintiffs could not satisfy the third Goonewardene factor given a contractual disclaimer limiting the contract's "rights or remedies" only to the parties and their successors and assigns).[2]

[2] The Court also agrees with defendants that Prouty fails to compel a different conclusion here, given that the specific contractual provision at issue in that case was "patently

Finally, the Court is not persuaded that statements made by Sunz’s employees and attorneys in the separate legal dispute between Sunz and defendants have any bearing on the question of whether plaintiffs have third-party beneficiary status. First, California law provides that “[w]hether a nonsignatory is an intended third party beneficiary to the contract is determined from the parties’ intent, as gleaned from the contract as a whole and the circumstances under which it arose.” Philadelphia Indem. Ins. Co. v. SMG Holdings, Inc., 44 Cal. App. 5th 834, 841 (2019). As discussed above, such intent cannot be gleaned from the CSA, and the parties have not presented any evidence of the contemporaneous circumstances under which the CSA arose. Second, the statements reflect, at most, that plaintiffs were in fact benefited or burdened by defendants’ performance under the CSA. Such a showing is “not sufficient” to establish third-party beneficiary status. See LaBarbera, 6 Cal. App. 5th at 1341; Goonewardene, 6 Cal. 5th at 830 (requiring that all three factors be satisfied).

Accordingly, the Court GRANTS defendants’ motion to dismiss plaintiffs’ first claim for relief.

Moreover, because plaintiffs are not third-party beneficiaries of the CSA, they “cannot maintain a cause of action for breach of the implied covenant of good faith and fair dealing.” See Oakland Raiders, 83 Cal. App. 5th at 477. Accordingly, the Court GRANTS defendants’ motion to dismiss plaintiffs’ second claim for relief.

## B. Tort Claims

### 1. Negligence

Defendants argue that plaintiffs’ third claim for professional negligence fails because plaintiffs do not establish the existence of a duty of care. Mot. at 14. Defendants argue that in California, insurance claims adjusters are “not liable in tort to the insured for alleged negligent claims handling which causes only economic loss.” Id. at 15 (quoting Sanchez v. Lindsey Morden Claims Servs., Inc., 72 Cal. App. 4th 249, 253 (1999)). Defendants argue that plaintiffs’ negligence claim “challenge[s] nothing more than [d]efendants’ performance of claims-handling functions on behalf of Sunz Insurance Co. and seeks to impose negligence liability based on the administration of insurance

intended” to confer third-party benefits to the class of which plaintiffs were a part. See Prouty, 121 Cal. App. 4th at 1233-34.

claims—precisely the type of claim-handling conduct addressed and rejected in Sanchez.” Id.

In opposition, plaintiffs argue that defendants’ cited authority is distinguishable. Opp. at 18. First, plaintiffs argue that Sanchez and Khachunts v. Gen. Ins. Co. of Am., 682 F. Supp. 3d 827 (C.D. Cal. 2023), involve first-dollar insurance coverage, by which the insurer bears the economic loss under the policy. Id. at 18-19. In contrast, plaintiffs argue that they bear the economic loss under the SIS program. Id. Plaintiffs further argue that “no known California appellate decision, before or since Sanchez, has extended this rule to a third-party administrator managing an insured-funded large-deductible workers’ compensation program.” Id. at 19.

Second, plaintiffs argue that Sanchez and related cases relied on the availability of alternative remedies against the insurer. Id. Plaintiffs argue that here, in contrast, “none of Synergy’s contractual relationships with the other program parties provides an adequate direct remedy.” Id. Plaintiffs argue that the SUNZ Action positions “[Sunz] itself as a victim” of defendants’ conduct, “cutting against any vicarious-liability theory Synergy might otherwise assert against SIC.” Id. Plaintiff further argues that its contractual remedies are limited to “the Loss Fund inflation” and require arbitration in Florida, in a forum where Next Level “is not a party.” Id. at 20-21. Finally, plaintiffs argue that their pleaded damages “go beyond economic loss” to include reputational harm, legal exposure, and increased future premiums. Id. at 20 n.1.

Finally, plaintiffs argue that California law imposes a general duty on defendants, pursuant to Cal. Civ. Code § 1714. Id. at 21. Plaintiffs argue that defendants must show that they fall within an exception to the general duty by applying the factors set forth in Rowland v. Christian, 69 Cal. 2d 108 (1968). Id. at 21. Plaintiffs argue that all the Rowland factors weigh in favor of the existence of defendants’ general duty to plaintiffs. Id. at 21-22.

In reply, defendants argue that even if Sanchez and related cases are distinguishable from the case at hand, plaintiffs have cited no authority to support their contention that the presence of a large deductible or reimbursement component warrants a finding of duty in an insured’s claim against a third-party claims administrator. Reply at 9-10. Defendants further argue that “none of [the cited] cases turned on the existence or absence of a deductible” but “instead turned on the nature of the relationship between the parties and the absence of a legally recognized duty.” Id. Defendants also argue that

the absence of an alternative remedy does not mandate a finding of duty under California law. Id. at 10. Finally, defendants argue that plaintiffs' analysis under Rowland rests on the faulty premise that "because plaintiffs allegedly experienced economic consequences from defendants' conduct, defendants must have owed them a duty." Id. at 11.

"The threshold element of a cause of action for negligence is the existence of a duty to use due care toward an interest of another that enjoys legal protection against unintentional invasion." Quelimane Co. v. Stewart Title Guar. Co., 19 Cal. 4th 26, 57-58 (1998). "Whether this essential prerequisite to a negligence cause of action has been satisfied in a particular case is a question of law to be resolved by the court." Id.

Whether a duty of care is owed is also "a question of *policy*." Sanchez, 72 Cal. App. 4th at 251 (emphasis in original). "An early enumeration of the policy concerns governing whether a duty of care should be imposed appears in Biakanja v. Irving," 49 Cal. 2d 647 (1958). See Sanchez, 72 Cal. App. 4th at 251. There, the California Supreme Court stated:

> The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm.

Biakanja, 49 Cal. 2d at 650; see also Goonewardene, 6 Cal. 5th at 838 (finding no duty owed by a third-party payroll company to an employee pursuant to Biakanja).

Notwithstanding any existing factual distinctions, Sanchez and related cases counsel against finding a duty of care here. As both parties acknowledge, California courts have held that "[a]n independent adjuster engaged by an insurer owes no duty of care to the claimant insured, with whom the adjuster has no contract." See, e.g., Sanchez, 72 Cal. App. 4th at 250-51. As far as the Court is aware, "no California case has held insurers' adjusters liable to insureds for negligence." See Sanchez, 72 Cal. App. 4th at 254. Indeed, "negligence is not among the theories of recovery generally available against *insurers*." Id. (emphasis in original). Accordingly, "[i]mposing a duty would significantly depart from existing law." Id. "Adjuster liability would be an empty slate,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL 'O'**

| | | | |
|---|---|---|---|
| Case No. | 2:26-cv-06550-CAS-BFMx | Date | October 19, 2026 |
| Title | Synergy HR LLC et al v. Next Level Administrators, LLC et al. | | |

upon which the courts would have to write a whole new body of 'adjuster liability' law." Id. at 255.

Moreover, the Court finds Sanchez's discussion of the Biakanja factors to be generally applicable to the instant case. First, the Sanchez court observed that an adjuster is generally "subject to the control of its clients, and must make discretionary judgment calls . . .[t]he insurer, not the adjuster, has the ultimate power to grant or deny coverage, and to pay the claim, delay paying it, or deny it." Id. at 253. Here, although plaintiffs argue that defendants had "de facto operational authority to withdraw funds from [the Claims Bank Account] without contemporaneous approval or spending controls" by Sunz or SIS, see Opp. at 23, the CSA states otherwise. See, e.g., CSA art. 3 (preserving Sunz's "ultimate settlement authority for all Claims" and mandating that defendants handle claims in compliance with "Program Handling Guidelines," which may not change without Sunz's "express written consent); id. § 2.2(b) (stating that defendants' investigations, adjustments, settlements, and denials are "subject to the ultimate authority" of Sunz); Daniels-Hall v. Nat'l Educ. Ass'n, 629 F.3d 992, 998 (9th Cir. 2010) (stating that while courts must "accept as true all well-pleaded allegations of material fact," courts are "not required to accept as true allegations that contradict exhibits attached to the [c]omplaint").

Second, as in Sanchez, "the adjuster has no contract with the insured and would face liability without the chance to limit its exposure by contract." Sanchez, 72 Cal. App. 4th at 253. Third,

> Imposing a duty also would subject the adjuster to conflicting loyalties. Insurers and insureds often disagree as to coverage or the amount of loss. An adjuster cannot argue both sides of such disputes, any more than a lawyer can represent opposite sides in a lawsuit. An adjuster owes a duty to the insurer who engaged him. A new duty to the insured would conflict with that duty, and interfere with its faithful performance. This is poor policy.

Id.

Third, as the Sanchez court observed, the imposition of a duty of care would do little to further deter third-party claims administrators, given the administrators' "exposure to liability to the *insurer* who engaged them." Id. at 253-43 (emphasis in original). Moreover, "*in most cases*," a duty of care would be "redundant" because the

insured could hold the insurer "liable for unreasonable investigation or claims handling." Id. at 254 (emphasis added). On that basis, the Sanchez court reiterated "*again*" that imposing a duty of care would "confer only a marginal additional benefit." Id. at 254 (emphasis added). Accordingly, contrary to plaintiffs' suggestion, the Sanchez court's reasoning did not turn on the availability of adequate alternative remedies in *all* cases involving third-party claims adjusters. See id. Instead, the Sanchez court noted that the availability of other remedies in *most* cases lent further support to the court's determination that there is little deterrence value in imposing a duty of care on third-party insurance adjusters. See id. Finally, the Court finds that, like in Sanchez, the costs of imposing a duty here may include increased insurance premiums for the insured. Id.

Finally, the Court does not consider the plaintiffs' reputational or other alleged non-economic injuries to be so fundamentally incomparable to pure economic losses that they warrant a departure from the line of reasoning set forth in Sanchez. Cf. Mintz v. Blue Cross of California, 172 Cal. App. 4th 1594, 1613 (2009) (distinguishing Sanchez to hold that a third-party administrator of health care benefits had a duty of care to insured parties to avoid "*physical harm* from decisions to deny treatments" (emphasis added)) (citation modified); see also Augustus v. Mercedes-Benz Fin. Servs. USA LLC, No. 2:25-CV-00533, 2025 WL 3050083, at *8 (C.D. Cal. Sept. 26, 2025) ("[C]ourts regularly find that alleged reputational damage is not recoverable under a negligence theory.").

Accordingly, the Court finds that under California law, defendants owe no duty of care to the insured. The Court therefore GRANTS defendants' motion to dismiss plaintiffs' third claim.

2. Fiduciary Duty

Defendants argue that no fiduciary relationship exists between defendants and plaintiffs. Mot. at 16. Defendants argue that "absent allegations establishing a separate relationship of trust and confidence beyond ordinary claims administration, a plaintiff cannot maintain a fiduciary duty claim against an insurer's claims administrator." Id. (citing Thompson, 224 Cal. App. 3d at 1418). Defendants argue that the complaint does not sufficiently allege facts to establish this type of "separate relationship." Id. at 16-17. Moreover, defendants argue that plaintiffs cannot rely on section 2.2(g)(i) of the CSA to establish a fiduciary duty, as any fiduciary obligations imposed by that provision are with respect to Sunz, not the insured. Id. at 17.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL** **'O'**

| | | | |
|---|---|---|---|
| Case No. | 2:26-cv-06550-CAS-BFMx | Date | October 19, 2026 |
| Title | Synergy HR LLC et al v. Next Level Administrators, LLC et al. | | |

In opposition, plaintiffs argue that "[t]he terms 'trust' and 'fiduciary capacity'" in section 2.2(g)(i) of the CSA "affirmatively establish [defendants'] duty; and [defendants'] fiduciary duty runs to Synergy because it is Synergy's funds in the Claims Bank Account and Synergy's economic interests that would be, and were, affected by mishandling." Opp. at 22. Plaintiffs also argue that defendants' relationship with plaintiffs is similar to an investment advisor/client fiduciary relationship, given defendants' "custodial authority over the Claims Bank Account through which Synergy's Loss Fund contributions flowed," "de facto operational authority to withdraw funds from that account without contemporaneous approval or spending controls" from SIS or Sunz, defendants' notice pursuant to section 2.2(f) of the CSA, and plaintiffs' reliance on defendants as the "sole administrator with operational control." Id. at 23-24.

In reply, defendants reiterate their argument that "economic impact does not create a fiduciary relationship." Reply at 11-12.

A fiduciary relationship is "any relationship between parties to a transaction wherein one of the parties is in duty bound to act with the utmost good faith for the benefit of the other party." Wolf v. Sup. Ct., 107 Cal. App. 4th 25, 29 (2003). For a fiduciary duty to exist, a person "must either knowingly undertake to act on behalf and for the benefit of another, or must enter into a relationship which imposes that undertaking as a matter of law." City of Hope Nat'l Med. Ctr. v. Genentech, Inc., 43 Cal. 4th 375, 386 (2008). While fiduciary duties are ordinarily "not impose[d] ... on commercial parties in arms' length relationships," such duties may be imposed "in special situations, such as when unusual circumstances give rise to an unusual level of trust or vulnerability." Kabushiki Kaisha Megahouse v. Anjar Co. LLC, No. 14-CV-598-CAS(CWx), 2014 WL 5456523, at *10 (C.D. Cal. Oct. 20, 2014). "A fiduciary duty can exist even in the absence of a relationship defined by law as long as a plaintiff can show an agreement between the fiduciary and the principal where the fiduciary accepts fiduciary responsibilities. The existence of such a relationship founded upon agreement is typically a question of fact." Storz Mgmt. Co. v. Carey, No. 2:18-CV-00068-DJC-DB, 2024 WL 3396128, at *5 (E.D. Cal. July 12, 2024) (citations omitted).

The Court finds that plaintiffs have not alleged facts that give rise to a plausible inference of a fiduciary duty. As discussed above, the plaintiffs' reliance on CSA section 2.2(g)(i) is not availing, given the provision's plain language. See CSA § 2.2(g)(i). Plaintiffs further allege that they "necessarily" put their "trust and confidence" in

defendants "by reason of Defendants' exclusive control over claims-handling decisions affecting Plaintiffs' economic interests." See Compl. ¶ 83. However, as already discusssed, these allegations are contradicted by the CSA's terms, and therefore the Court need not accept them as true. See Daniels Hall, 629 F.3d at 998. Moreover, even assuming the truth of these allegations, plaintiffs fail to allege facts to sustain an inference that defendants "knowingly undertook" a fiduciary duty, i.e., that defendants "entered into [the relationship] with the view of acting primarily for the benefit of [plaintiffs]" and "subordinat[ing] its interests to those of [plaintiffs]." See Moore v. Verizon Commc'ns Inc., No. C 09-1823, 2010 WL 3619877, at *14 (N.D. Cal. Sept. 10, 2010) (citation modified). Instead, the complaint "does not reveal anything other than an ordinary arm's-length business relationship between the insured and the insurers and its agents." See Thompson, 224 Cal. App. 3d at 1418-19 (quoting Henry, 217 Cal. App. 3d at 1405).

Plaintiffs also fail to demonstrate that there exists a fiduciary relationship as a matter of law. Plaintiffs' cited authority, Hasso v. Hapke, 227 Cal. App. 4th 107 (2014), is inapposite. Hasso involved an alleged "investment adviser/client relationship," which "giv[es] rise to a fiduciary duty as a matter of law" so long as the alleged fiduciary met California's statutory definition of "investment advisor" pursuant to Cal. Corp. Code § 25009(a) or was a "party to a confidential relationship that gives rise to a fiduciary duty under common law." Id. at 140. The court concluded that the defendant "was not an investment adviser within the meaning of California statutory law" and declined to consider whether the defendant met common law requirements. Id. at 141, 151. Because there is no contention that defendants here meet the statutory definition of "investment advisor," the Court does not find that the decision offers persuasive value.

Accordingly, the court GRANTS defendants' motion to dismiss plaintiffs' fourth claim for relief.

3. Tort of Another

Defendants argue that the "tort of another" doctrine is not a standalone claim for relief, but instead "provides a potential category of damages where a defendant's tortious conduct has required the plaintiff to incur attorney's fees in litigation with a third party." Mot. at 16. Defendants argue that plaintiffs' ability to recover such damages depends in part on "the existence of a viable underlying tort claim." Id. at 18. Defendants argue that

because plaintiffs fail to establish the existence of such a claim, and because there is no standalone claim for relief stated, this claim must fail. Id.

In opposition, plaintiffs acknowledge that the tort of another doctrine does not set forth an independent claim for relief. Opp. at 24. Plaintiffs argue that this claim survives because (1) they have adequately pleaded viable underlying tort claims, and (2) a claim's label is not dispositive of its viability. Id. at 25.

In reply, defendants argue that plaintiffs have conceded that their tort of another claim cannot survive as a standalone claim. Reply at 12.

There remains no viable tort claim on which plaintiff can recover damages pursuant to the tort of another doctrine. Accordingly, the Court GRANTS defendants' motion to dismiss plaintiffs' fifth claim. See Multani v. Pro Value Props., Inc., No. CV166400, 2016 WL 11746298, at *2 (C.D. Cal. Nov. 29, 2016) ("Without an underlying 'tort' as to some party, the theory of 'tort of another' as to Defendants fails as a matter of law.").

### C. Leave to Amend

In the event of dismissal, plaintiffs request leave to amend. Opp. at 25-26. Although it appears that leave to amend would be futile as to certain of plaintiffs' claims, the Court GRANTS plaintiffs fourteen (14) days leave to amend to reassert their claims, if appropriate.

## V. CONCLUSION

In accordance with the foregoing, the Court hereby **GRANTS** defendants' motion to dismiss plaintiff's first claim for breach of contract as a third-party beneficiary.

The Court **GRANTS** defendants' motion to dismiss plaintiffs' second claim for breach of the implied covenant of good faith and fair dealing.

The Court **GRANTS** defendants' motion to dismiss plaintiffs' third claim for professional negligence/claims mishandling.

The Court **GRANTS** defendants' motion to dismiss plaintiffs' fourth claim for breach of fiduciary duty.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL 'O'**

| | | | |
|---|---|---|---|
| Case No. | 2:26-cv-06550-CAS-BFMx | Date | October 19, 2026 |
| Title | Synergy HR LLC et al v. Next Level Administrators, LLC et al. | | |

The Court **GRANTS** defendants' motion to dismiss plaintiffs' fifth claim for tort of another.

In the event that plaintiffs choose to amend their pleadings, plaintiffs' first amended complaint is due within fourteen (14) days of the date of this order.

IT IS SO ORDERED.

00 : 30

Initials of Preparer CMJ